72 P.3d 788 (2003)
SOUND BUILT HOMES, INC., Respondent,
v.
WINDERMERE REAL ESTATE/SOUTH, INC., Appellant.
No. 28106-6-II.
Court of Appeals of Washington, Division 2.
July 15, 2003.
*789 Harold T. Hartinger, Vandeberg Johnson & Bandara, Tacoma, WA, for Respondent.
*790 Matthew F. Davis, Attorney at Law, Seattle, WA, for Appellant.
MORGAN, J.
Sound Built Homes, Inc. (Sound Built), and Windermere Real Estate/South, Inc. (Windermere), were contractual co-obligors against whom Michael Mastro obtained a judgment. Sound Built paid Mastro's judgment, then sued Windermere for the entire amount paid. The trial court granted the entire amount, prompting Windermere to bring this appeal. Because Sound Built and Windermere were contractual co-obligors who had not agreed otherwise, we hold that Sound Built is entitled to recover half, but not all, of what it paid on Mastro's judgment.
In 1993, Michael Mastro owned certain real property. John Mastrandrea was one of Mastro's employees. Marvin Pinkus was an associate broker with Windermere. Mastro authorized Mastrandrea to act for him on some but not all matters related to that property. Mastro did not authorize Mastrandrea to sign an earnest money agreement or amendments to such an agreement. Mastrandrea informed Pinkus that Mastro's property was for sale, and Pinkus procured Sound Built as a possible buyer.
On August 4, 1993, Mastro signed an earnest money agreement whereby he was to sell the property and Sound Built was to buy it. The agreement was to lapse unless certain contingencies were removed within 30 days. The agreement obligated Mastro to pay Windermere's commission and provided that if a dispute later arose, the prevailing party could recover its reasonable attorney fees as follows:
14. Default or Failure to Perform.... In the event of any dispute in connection with the terms and conditions of this Agreement, ... or if suit shall be brought, the prevailing party shall be entitled to recover reasonable court costs and attorney's fees.[[1]]
On September 3, 1993, the agreement lapsed because the contingencies had not been removed. Pinkus wanted to revive it, so he prepared a written extension agreement. After Sound Built signed the extension agreement, Pinkus asked Mastrandrea to obtain Mastro's signature. A short time later, the agreement was returned with what appeared to be Mastro's signature on it. In reality, however, Mastrandrea had forged Mastro's signature, and Mastro still thought the earnest money agreement had lapsed.
In October 1993, Sound Built sold its "interest" in the property to Robinson Homes. In July 1994, Mastro sold his interest to Judi Homes.
In the early fall of 1994, the parties learned that Mastro's signature had been forged. In January 1995, Mastro closed his deal with Judi Homes, over Pinkus's and Robinson Homes's objections.
Meanwhile, in October 1994, Robinson sued Mastro, Mastrandrea, Sound Built, and Windermere in the King County Superior Court. Mastrandrea defaulted. Mastro defended on the ground that the 1993 earnest money agreement had lapsed 30 days after its formation. Except for attorney fees, Mastro did not make any counterclaims or crossclaims. Windermere counter-claimed against Mastro for a commission. Sound Built cross-claimed against Windermere for reimbursement of whatever amount it might be required to pay Mastro, alleging "equitable indemnity" and negligent misrepresentation.
In September 1996, after a bench trial, the King County Superior Court ruled that Mastro had not breached any contract and that all claims against him should be dismissed. The court ruled that Sound Built had failed to show that it was entitled to equitable indemnity, reasoning in part:
73. Sound Built became involved in the subject litigation based, in part at least, on its own actions. As a result, Sound Built's equitable indemnity claim against Windermere cannot lie.[[2]]
The court also ruled that Sound Built had failed to prove negligent misrepresentation, reasoning in part:
*791 74. As to Sound Built's claim for indemnity against Windermere based on negligent misrepresentation, Sound Built shares responsibility with Windermere for any acts giving rise to potential liability to [Robinson].... Sound Built further knew, or should have known, ... that there were serious questions about Mastandrea's authority.[[3]]
The court concluded that Mastro "is entitled to judgment against Windermere, Sound Built and Robinson, jointly and severally, for reasonable attorney fees and costs."[4] In November and December 1996, the court granted judgment against Robinson, Sound Built, and Windermere for Mastro's reasonable attorney fees in the amount of $50,000, plus costs of $321.
Sound Built appealed to Division One. It arguedfor the first time on appealthat Windermere had impliedly warranted that Windermere had authority to act for Mastro. Sound Built also argued, as it had in the trial court, that Windermere had negligently misrepresented the genuineness of Mastro's signature on the extension agreement.
Windermere cross-appealed to Division One. It argued, as it had in the trial court, that it should not be required to pay Mastro's reasonable attorney fees.
Division One declined to consider the implied warranty theory that Sound Built was raising on appeal for the first time.[5] Division One affirmed in all other respects,[6] the Supreme Court denied review,[7] and the King County judgment became final.
Even before the appeals were finished, Mastro demanded that Sound Built satisfy his judgment for attorney fees and costs. Sound Built acceded in December 1999, paying $69,280.71 ($50,000 in principal, $321 in costs, and the remainder in judgment interest). In return, Mastro assigned his judgment to Sound Built.
On February 8, 2000, Sound Built sued Windermere in the Pierce County Superior Court. It alleged that Windermere should indemnify it in the amount of $69,280.71 plus ongoing interest, as well as its "costs and disbursements in this action[.]"[8] Windermere responded in part by asserting res judicata and collateral estoppel.
In August 2001, the Pierce County court held a bench trial on stipulated facts. It ruled that Sound Built's action was "not barred by collateral estoppel, res judicata, or other rules relating to `claim splitting.'"[9] It also ruled that "Windermere breached its implied warranty of agency authority when it represented to [Sound Built] that a forged document (Exhibit P) revived an expired real estate purchase agreement (Exhibit N)."[10] It concluded that "Sound Built is entitled to indemnity on an implied contract under agency law for Windermere's actions purportedly taken as agent for Mr. Mastro."[11]
On October 26, 2001, the Pierce County court entered a judgment for Sound Built and against Windermere in the amount of $117,600 (Mastro's judgment for attorney fees, interest on that judgment to date, and $33,797 in reasonable attorney fees and costs incurred by Sound Built in the Pierce County action). Windermere then filed this appeal.
Sound Built claims complete indemnity from Windermere. Windermere responds that Sound Built is entitled to contribution, but not to complete indemnity. We address indemnity first and contribution second.

*792 I.
Sound Built alleges that Windermere must indemnify it for the entire amount of the King County judgment, plus interest, costs, and fees. Sound Built claims that Windermere impliedly warranted its authority to act for Mastro, that Windermere breached its warranty, and that the breach caused damage to Sound Built. Windermere responds that the final King County judgment precludes Sound Built from now bringing such a claim.

A.
Preliminarily, we examine the nature of Sound Built's claim. In general, an agent who forms a contract in the name of his or her principal impliedly "warrants" to the third party that he or she has authority to contract in the principal's name.[12] This will not be true, however, if the agent "sufficiently manifests" to the contrary.[13] The agent who makes such a warranty will be liable to the third party if it later turns out, with or without fault on the agent's part, that the agent did have the principal's authority to form the contract. The agent who does not make such a warranty will be liable to the third party only for negligence or deceit (i.e., for a misrepresentation that is negligent or "fraudulent," but not for a misrepresentation that is "innocent" in the sense of having been made without fault).[14]
*793 A real estate agent is usually the agent of the seller.[15] When that is the case, unless otherwise agreed, a real estate agent has authority to procure a willing and able buyer, but not authority to sell the land.[16] Logically then, the agent impliedly warrants his or her authority to find a buyer, but not, without more, his or her authority to sell the land.
In this case, Sound Built might be claiming that Windermere breached an implied warranty of authority to find a buyer. If it is, however, its claim fails. As the movant in this summary judgment proceeding, Sound Built had "the initial burden of showing the absence of an issue of material fact"[17]or, in more specific terms, that Windermere lacked Mastro's authority to find a buyer. Although the record shows that Mastrandrea forged the extension agreement, it does not show whether Mastro and Windermere had a valid listing agreement when, in September 1993, Windermere was brokering the extension agreement. Thus, the record does not show that Windermere lacked Mastro's authority to find a willing and able buyer, or that Windermere breached an implied warranty of authority to find a willing and able buyer.
Sound Built cannot reasonably be claiming that Windermere made or breached an implied warranty of authority to sell the land. As a real estate developer, Sound Built clearly knew that Windermere had authority to find a willing and able buyer, but not authority to sell the land.
What Sound Built seems actually to be claiming is that Windermere impliedly warranted the genuineness of Mastro's signature on the extension agreement. The question thus raised is whether a real estate agent impliedly warrants, regardless of fault, the genuineness of his or her principal's signature on an earnest money agreement. The Washington courts have not addressed this question, although they have addressed a question that is arguably related.[18] Neither party has briefed or argued the question, despite its potential difficulty.[19] If we needed to answer the question here, we would order additional briefing. We choose, however, to resolve the case on other grounds.

B.
Windermere asserts that the final King County judgment precludes Sound Built from bringing its claim for indemnity. Windermere reasons that Sound Built may not re-prosecute a claim that it previously prosecuted *794 or should have prosecuted to finality. Sound Built does not deny that it prosecuted a claim to finality in King County, but it does deny that it is now re-prosecuting the same claim. It urges that its King County claim was for "equitable indemnity" and negligent misrepresentation, while its Pierce County claim is for "breach of warranty."
In Kelly-Hansen v. Kelly-Hansen,[20] we observed that claim preclusion, often called "res judicata,"
encompasses the idea that when the parties to two successive proceedings are the same, and the prior proceeding culminated in a final judgment, a matter may not be relitigated, or even litigated for the first time, if it could have been raised, and in the exercise of reasonable diligence should have been raised, in the prior proceeding. As already noted, the Supreme Court has said that "res judicata acts to prevent relitigation of claims that were or should have been decided among the parties in an earlier proceeding." The Court has also said, on numerous occasions, that res judicata
applies, except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at that time.
And the Court has further said:
This court from early years has dismissed a subsequent action on the basis that the relief sought could have and should have been determined in a prior action. The theory on which dismissal is granted is variously referred to as res judicata or splitting causes of action.
. . . .
Although many tests have been suggested for determining whether a matter should have been litigated in a prior proceeding, there is no simple or all-inclusive test. Instead, it is necessary to consider a variety of factors, including, according to the Supreme Court, whether the present and prior proceedings arise out of the same facts, whether they involve substantially the same evidence, and whether rights or interests established in the first proceeding would be destroyed or impaired by completing the second proceeding.... [I]t has been held that a matter should have been raised and decided earlier if it is merely an alternate theory of recovery, or an alternate remedy.[[21]]
The Restatement of Judgments (Second) puts these principles into national and historical perspective. Section 24(1) suggests that a "claim" should include "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."[22] Section 24(2) suggests that the scope of a "transaction" should be "determined pragmatically," essentially by examining the relevant facts and circumstances.[23] The accompanying comments explain that Section 24 takes this "transactional view of [a] claim"[24] for the following reasons:
a. Rationale of a transactional view of claim .... [Section 24] responds to modern procedural ideas which have found expression *795 in the Federal Rules of Civil Procedure and other procedural systems.
"Claim," in the context of res judicata, has never been broader than the transaction to which it related. But in the days when civil procedure still bore the imprint of the forms of action and the division between law and equity, the courts were prone to associate claim with a single theory of recovery, so that, with respect to one transaction, a plaintiff might have as many claims as there were theories of the substantive law upon which he could seek relief against the defendant. Thus, defeated in an action based on one theory, the plaintiff might be able to maintain another action based on a different theory, even though both actions were grounded upon the defendant's identical act or connected acts forming a single life-situation. In those earlier days there was also some adherence to a view that associated claim with the assertion of a single primary right as accorded by the substantive law, so that, if it appeared that the defendant had invaded a number of primary rights conceived to be held by the plaintiff, the plaintiff had the same number of claims, even though they all sprang from a unitary occurrence.... Still another view of claim looked to sameness of evidence; a second action was precluded where the evidence to support it was the same as that needed to support the first.... Even so, claim was not coterminous with the transaction itself.
The present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split.
This definition of claim to engross the relevant transaction ... simplifies the application of the rules of merger and bar...; it enhances the benefits deriving from those rules without causing undue hardship. Equating claim with transaction, however, is justified only when the parties have ample procedural means for fully developing the entire transaction in the one action going to the merits to which the plaintiff is ordinarily confined. A modern procedural system does furnish such means.... The law of res judicata now reflects the expectation that parties who are given the capacity to present their "entire controversies" shall in fact do so.
. . . .

b. Transaction: application of a pragmatic standard. The expression "transaction, or series of connected transactions," is not capable of a mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the cases. And underlying the standard is the need to strike a delicate balance between, on the one hand, the interests of the defendant and of the courts in bringing litigation to a close and, on the other, the interest of the plaintiff in the vindication of a just claim.
. . . .
In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes.... [[25]]
The Washington Supreme Court has applied these principles for decades. Its cases include Schoeman v. New York Life Insurance Co.,[26]Bill v. Gattavara,[27]Currier v. *796 Perry,[28]Tacoma Mill Co. v. Northern Pacific Railway Co.,[29]Sweeney v. Frank Waterhouse & Co.,[30] and Sayward v. Thayer.[31]
Since 1994 or 1995, Sound Built has been claiming that Windermere should provide reimbursement[32] for any amounts Sound Built had to pay to Mastro. In the King County action, its theories were "equitable indemnity" and negligent misrepresentation (i.e., that Windermere, with negligence, inaccurately represented that it had Mastro's authority to do some act[33]). In this Pierce County action, its theory has been that Windermere breached an implied warranty of authority (i.e., that Windermere, with or without negligence or other fault, inaccurately represented its authority, with or without fault). It is apparent that all three theories were based on the same facts, the same evidence, and the same transaction. At bottom then, Sound Built's position is that a party can bring as many actions as he or she has substantive legal theories, even if all theories involve the same facts, the same evidence, and the same transaction.
Based on the foregoing authorities, we reject this position. Holding that the only difference between the King and Pierce County actions is the substantive legal theory on which Sound Built relied, we conclude that Sound Built is trying to re-litigate in Pierce County a claim that it already lost in King County; that Sound Built is precluded by law from doing that; and that Sound Built's claim for indemnity should be dismissed.

II.
The parties agree that if Sound Built is not entitled to indemnity, it is entitled to contribution. They dispute, however, whether contribution should be measured under RCW 4.22.040. We address (A) whether RCW 4.22.040 applies, and (B) if not, what does.

A.
RCW 4.22.040(1) requires that "contribution among liable persons" be based on "the comparative fault of each[.]" It provides:
A right of contribution exists between or among two or more persons who are jointly and severally liable upon the same indivisible claim for the same injury, death or harm, whether or not judgment has been recovered against all or any of them.... The basis for contribution among liable *797 persons is the comparative fault of each such person ....[[34]]
By its plain terms, this section applies when "the basis for contribution ... is the comparative fault" of each liable person. By negative but necessary implication, it does not apply when the basis of contribution is entirely contractual, for such basis exists irrespective of fault.
The King County court's 1996 judgment furnishes the basis for contribution here. In that judgment, the court did not make Windermere and Sound Built jointly liable for Mastro's attorney fees and costs because the court thought Windermere and Sound Built were at fault. Rather, the court made Windermere and Sound Built liable because it thought that they both had contracted to comply with the attorney fee clause in the 1993 earnest money agreement. Contribution here is contractually-based, not fault-based, and RCW 4.22.040 does not apply.

B.
According to the Washington Supreme Court, contribution between or among contractual co-obligors "is based upon the equitable principles that, where several parties are equally liable for the same debt and one is compelled to pay the whole of it, he may have contribution against the others to obtain from them the payment of their respective shares."[35] The one who seeks contribution "may recover ... only the excess which he has paid over his share."[36] Insofar as the one who seeks contribution is entitled to recover, the party from whom contribution is sought must pay a share computed by dividing the number of solvent obligors into the relevant obligation.[37] In general, these same rules apply to joint debtors on a judgment.[38]
By virtue of the 1993 earnest money agreement and the King County court's final judgment, Windermere and Sound Built became contractual co-obligors for Mastro's reasonable attorney fees and costs. Sound Built was forced to pay the entire judgment, although Windermere should have paid half. Accordingly, Sound Built is now entitled to a judgment against Windermere for one half of the amount that Sound Built paid to discharge Mastro's judgment (i.e., for one half of the principal on Mastro's judgment, plus one half of the interest that Sound Built paid in order to discharge that judgment). Sound Built's judgment against Windermere shall bear prejudgment interest from the date on which Sound Built discharged Mastro's judgment, for that is the date on which Sound Built's contribution claim came into being and was liquidated.[39] Neither Sound Built nor Windermere is entitled to reasonable attorney fees or costs in this Pierce County action, as neither has prevailed more than the other.
*798 Reversed and remanded for entry of judgment as indicated herein.
We concur: SEINFELD, J., and HUNT, C.J.
NOTES
[1] Exhibit (Ex.) N at 4.
[2] Ex. A at 18.
[3] Ex. A at 18-19.
[4] Ex. B at 6, Conclusion of Law 5; Ex. B at 2, Finding of Fact 6.
[5] Robinson Homes, Inc. v. Mastro, No. 39678-1-I, slip op. at 2, 90 Wash.App. 1054, 1998 WL 251994, *1 (Wash.Ct.App. May 18, 1998) ("We decline to review Sound Built's new theory of recovery raised for the first time on appeal").
[6] Robinson Homes, No. 39678-1-I.
[7] Robinson Homes, Inc. v. Mastro, 139 Wash.2d 1005, 989 P.2d 1138 (1999).
[8] CP at 5.
[9] CP at 120.
[10] CP at 120.
[11] CP at 120.
[12] RESTATEMENT (SECOND) OF AGENCY § 329 (1958) ("A person who purports to make a contract, conveyance or representation on behalf of another... whom he has no power to bind, thereby becomes subject to liability ... upon an implied warranty of authority unless he has manifested that he does not make such warranty or the other party knows that the agent is not so authorized."); RESTATEMENT § 329 cmt. a ("When an agent purports to make a contract ... the agent represents that he has power so to bind the principal"); see also Routh v. Wagner, 53 Wash.2d 347, 350, 333 P.2d 674 (1959) ("It is well settled that agent who exceeds his authority, so that his principal is not bound, will himself be liable for the damage occasioned to the other contracting party."); Equipto Div. Aurora Equip. Co. v. Yarmouth, 83 Wash.App. 817, 823 n. 12, 924 P.2d 405 (1996) (an agent who "contract[s] with a third party ... impliedly, if not expressly, represents that he is in fact authorized by his principal to make the contract") (citation omitted), reversed on other grounds, 134 Wash.2d 356, 950 P.2d 451 (1998); Dep't of Retirement Systems v. Kralman, 73 Wash.App. 25, 29, 867 P.2d 643 (1994) ("An agent who purports to make a representation on behalf of another, but has no power to bind, is personally liable"); Riverside Research Institute v. KMGA, Inc., 68 N.Y.2d 689, 506 N.Y.S.2d 302, 497 N.E.2d 669, 671 (1986) ("An agent implicitly warrants its own authority to act"); Barnes v. Southwestern Bell Telephone Co., 596 F.Supp. 1046, 1050 (W.D.Ark.1984) (an agent "impliedly represents ... that he has authority to act for [the principal]") (citation omitted).
[13] RESTATEMENT (SECOND) OF AGENCY § 331 (1958) ("A person who purports to make a contract, conveyance or representation on behalf of a principal whom he has no power to bind thereby is not subject to liability ... if he sufficiently manifests that he does not warrant his authority and makes no tortious misrepresentation".); RESTATEMENT § 331 cmt. b ("If the agent gives notice to the third person that the existence of the authority is not warranted, he is not liable"); see also A. Leschen & Sons Rope Co. v. Case Shingle & Lumber Co., 152 Wash. 37, 45, 276 P. 892, (1929) (third-party "had the right to assume authority upon the part of the agent unless [he] had notice of some limitation upon the authority of the agent"); Dep't of Retirement Systems v. Kralman, 73 Wash.App. at 29, 867 P.2d 643 (third party not entitled to rely on agent's representation of authority "when put on notice that a question exists as to the agent's authority"); Glendale Realty, Inc. v. Johnson, 6 Wash.App. 752, 756, 495 P.2d 1375 (1972) (same); Broughton v. Dona, 101 A.D.2d 897, 475 N.Y.S.2d 595, 596-97 (N.Y.App.Div.1984) (agent liable to third person only if "lack of authority was not manifested"); Duncan v. Peninger, 624 F.2d 486, 490 (4th Cir. 1980) (agent not liable where third person was "chargeable with knowledge that [agent] had no authority"), cert. denied, 449 U.S. 1078, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981); Yoakum v. Tarver, 256 Cal.App.2d 202, 64 Cal.Rptr. 7, 10 (1967) (agent not liable where he manifested his authority was conditional).
[14] RESTATEMENT (SECOND) OF AGENCY § 330 (1958) ("A person who tortiously misrepresents to another that he has authority to make a contract, conveyance or representation on behalf of a principal whom he has no power to bind is subject to liability to the other in an action of tort for loss caused by reliance on such misrepresentation."); RESTATEMENT § 331 (quoted in preceding note); see also Glendale Realty, Inc. v. Johnson, 6 Wash. App. at 757, 495 P.2d 1375 ("Where a special agent exceeds his limited authority, he is liable... for the fraudulent representations"); Swanson v. American Hardware Mut. Ins. Co., 359 N.W.2d 705, 708 (Minn.Ct.App.1984) ("If an agent tortiously misrepresents that it has authority to make a representation on behalf of a principal whom it has no power to bind, it is liable to the other party").
[15] See, e.g., Holst v. Fireside Realty, Inc., 89 Wash.App. 245, 256, 948 P.2d 858 (1997) (listing agent generally acts as agent for seller, not buyer).
[16] Larson v. Bear, 38 Wash.2d 485, 489-90, 230 P.2d 610 (1951) ("real-estate salesman is a special agent with authority limited to finding a purchaser of the property his principal has listed for sale[;]" real estate salesman does not have "implied authority to make a contract of sale"); Lee v. Estabrook, 28 Wash.2d 102, 108, 181 P.2d 830 (1947) ("the employment of a real estate broker to sell land does not authorize the broker to enter into a contract binding his principal to convey the land"); Samson v. Beale, 27 Wash. 557, 567, 68 P. 180 (1902) (real estate broker's "[a]uthority to sell must exist by reason of special authorization").
[17] Young v. Key Pharmaceuticals, Inc., 112 Wash.2d 216, 225, 770 P.2d 182 (1989).
[18] See Hoffman v. Connall, 108 Wash.2d 69, 72, 77-78, 736 P.2d 242 (1987) (real estate agent does not warrant or guarantee accuracy of boundary information provided by seller; although agent may be liable if negligent or deceitful, he or she is not liable for "innocent" misrepresentation (i.e., a representation made without negligence or deceit)).
[19] An affirmative answer might arguably be supportable because the real estate agent is generally in a better position than the buyer to know whether the principal's signature is genuine. A negative answer might arguably be supportable because, if a real estate agent does not "warrant" the genuineness of boundaries, see Hoffman, 108 Wash.2d at 72, 77-78, 736 P.2d 242, he or she also may not warrant the genuineness of the principal's non-notarized signature; and also because, if Washington wanted to insure the genuineness of a signature on an earnest money, it could require (which it does not) that the signature be notarized. See RCW 64.04.020 ("Every deed shall be in writing, signed by the party ... and acknowledged by the party before some person authorized ... to take acknowledgement of deeds"); RCW 59.04.010 ("Leases may be in writing ... and shall be legal and valid for any term or period not exceeding one year, without acknowledgement, witnesses or seals"). It is likely that other considerations also apply.
[20] 87 Wash.App. 320, 941 P.2d 1108 (1997).
[21] Kelly-Hansen, 87 Wash.App. at 328-31, 941 P.2d 1108 (footnotes omitted).
[22] RESTATEMENT (SECOND) OF JUDGMENTS § 24(1) (1982) provides:

When a valid and final judgment ... extinguishes the plaintiff's claim ... the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
[23] RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1982) provides:

What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.
[24] RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) cmt. a (1982).
[25] RESTATEMENT (SECOND) OF JUDGMENTS § 24 cmts. a-b (1982).
[26] 106 Wash.2d 855, 859, 726 P.2d 1 (1986) (claim for life insurance proceeds precluded later claim for negligent issuance of same policy; "[i]f a matter has been litigated or there has been an opportunity to litigate on the matter in a former action, the party-plaintiff should not be permitted to relitigate that issue").
[27] 34 Wash.2d 645, 209 P.2d 457 (1949) (plaintiff sued a landowner and others for timber trespass; after final judgment for landowner, plaintiff sued landowner for unjust enrichment based on same facts; new claim precluded).
[28] 181 Wash. 565, 569, 44 P.2d 184 (1935) (first action for injunction compelling possession and delivery of title to corporate stock; second action for damages based on conversion of same stock; second action was precluded by first; "res judicata applies ... not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time") (quoting Sayward v. Thayer, 9 Wash. 22, 24, 36 P. 966 (1894), and citing numerous other cases).
[29] 102 Wash. 95, 98, 172 P. 812 (1918) (first suit to enjoin violation of written agreement; second suit to reform same agreement; second suit precluded by first; "an adjudication ... is final and conclusive, not only as to the matters actually determined, but as to every other matter which the parties could and ought to have litigated as incident thereto and coming within the legitimate purview of the subject-matter of the action").
[30] 43 Wash. 613, 617, 86 P. 946 (1906) (plaintiff sued in own name, not as assignee, even though he had already received an assignment; after losing, plaintiff filed second suit as assignee; second suit precluded, as litigant may not "experiment with a court by trying his case piecemeal").
[31] 9 Wash. at 24, 36 P. 966 ("res judicata applies... not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time").
[32] See Central Washington Refrigeration, Inc. v. Barbee, 133 Wash.2d 509, 513, 946 P.2d 760 (1997) ("Indemnity in its most basic sense means reimbursement ... and may lie when one party discharges a liability which another should rightfully have assumed").
[33] As discussed in Section I-A, we are unsure of the "act" that Sound Built is referring to.
[34] RCW 4.22.040(1) (emphasis added).
[35] Appleford v. Snake River Mining, Milling & Smelting Co., 122 Wash. 11, 15, 210 P. 26 (1922).
[36] Proff v. Maley, 14 Wash.2d 287, 291, 128 P.2d 330 (1942); 18 AM.JUR.2D Contribution § 22 (1985).
[37] See 18 AM.JUR.2D Contribution § 22 (1985); ARTHUR L. CORBIN, CONTRACTS § 924, at 620 (interim ed.2002); see also Franco v. Peoples Nat'l Bank of Washington, 39 Wash.App. 381, 387, 693 P.2d 200 (1984) (co-guarantor who sues in contribution must "collect equally and ratably among" the other coguarantors) (citation omitted); Hanson v. Hanson, 55 Wash.2d 884, 887-88, 350 P.2d 859 (1960) (wife due ½ of debt she paid post-divorce because former spouses "become joint debtors as to undisclosed obligations"); Proff v. Maley, 14 Wash.2d 287, 291, 128 P.2d 330 (1942) (where case settled for $4,640, each of four obligees owed $1,160); Appleford, 122 Wash. at 15, 210 P. 26 (coguarantor "is required to collect equally and ratably" among other coguarantors); Lindblom v. Johnston, 92 Wash. 171, 173, 179, 158 P. 972 (1916) (judgment entered against A, B, and C as contractual co-obligors; A and B paid judgment in full; acting in his own name and also as B's assignee, A sued C for contribution; C held liable for one-third); Brooke v. Boyd, 80 Wash. 213, 217, 141 P. 357 (1914) ("where five stockholders executed a note... they thereby became co-sureties for it and each was liable to pay one-fifth of the whole and no more") (citation omitted).
[38] See 18 AM.JUR.2D Contribution § 37 (1985).
[39] See Prier v. Refrigeration Eng'g Co., 74 Wash.2d 25, 32-34, 442 P.2d 621 (1968).